**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **NGHI TA**, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>**QUANTUM HEALTH, INC.**,<br><br>Defendant. | Case No. 2:26-cv-01095<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Nghi Ta ("Plaintiff") brings this Class Action Complaint, individually and on behalf of all others similarly situated, against Defendant Quantum Health, Inc. ("Quantum Health" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to him, which are based on personal knowledge:

## NATURE OF THE CASE

1. Plaintiff brings this class action against Quantum Health for its failure to properly secure and safeguard Plaintiff's and other similarly situated current and former members of its clients' employer-sponsored health plans ("Class Members") sensitive information, including names, dates of birth, email addresses, phone numbers, mailing addresses, health insurance policy numbers, claims information, benefits details, provider names and dates of services (collectively personally identifiable information ("PII")).[1]

2. In addition, Plaintiff also brings this class action against Quantum Health for its

[1] *See* Quantum Health, *Data Security Incident Notice – July 31, 2026*, https://quantum-health.com/status (last visited Sep. 3, 2026).

failure to properly secure and safeguard Plaintiff's and Class Members' protected health information ("PHI") including medical diagnoses, treatment information, and prescriptions.[2]

3. PII and PHI are collectively referred to as "Private Information."

4. Quantum Health, Inc. Inc. is a healthcare navigation and care coordination company that helps people access benefits, providers, and health-related services.

5. Plaintiff and Class Members are required to provide Defendant with their Private Information and/or the Private Information of their family members. Because of this, Quantum Health has a duty to secure, maintain, protect, and safeguard the Private Information that it collects and stores against unauthorized access and disclosure through reasonable and adequate data security measures.

6. Despite Quantum Health's duty to safeguard the Private Information of its current and previous members of its clients' employer-sponsored health plans, Plaintiff's and Class Members' Private Information was compromised in a data breach when, on or about June 1, 2026, Defendant "detected a service outage, which affected the availability of certain internal and external systems." (the "Data Breach").[3]

7. The Data Breach occurred in part because Quantum Health stored Plaintiff's and Class Members' Private Information in an unencrypted, Internet-accessible environment.

8. After Quantum Health discovered the Data Breach in June 2026, it conducted an investigation which "determined that the service outage was related to unauthorized access to our IT network, resulting from a user responding to a vishing call on May 29, 2026. Between May 29, 2026 and June 1, 2026, the unauthorized party accessed and acquired files from certain Quantum

---

[2] *Id.*

[3] *Id.*

Health systems."[4]

9. Despite learning about the breach in June of 2026, Quantum Health waited until August of 2026 to begin notifying impacted individuals of the unauthorized access.

10. Based on publicly available information, the Private Information impacted by the Data Breach includes a wide swath of highly sensitive information belonging to Quantum Health's current and former members of its clients' employer-sponsored health plans, as well as certain of their family members, including their names, health insurance policy numbers, claims information, benefits details, medical diagnoses, treatment information, prescriptions, provider names, dates of service, dates of birth, email addresses, phone numbers, and mailing addresses.[5]

11. As a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiff's and Class Members' Private Information is now exposed to cybercriminals.

12. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, intrusion of their health privacy, and similar forms of criminal mischief, risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

13. Plaintiff, on behalf of himself and all others similarly situated, alleges claims for negligence, breach of implied contract, unjust enrichment and declaratory judgment arising from the Data Breach. Plaintiff seeks damages and injunctive relief, including the adoption of reasonably sufficient practices to safeguard the Private Information in Defendant's custody to

[4] *Id.*
[5] *Id.*

prevent incidents like the Data Breach from reoccurring in the future, and for Defendant to provide identity theft protective services to Plaintiff and Class Members for their lifetimes.

## PARTIES

14. Plaintiff Nghi Ta is an adult, who at all relevant times, was a resident and citizen of the state of Pennsylvania. Plaintiff received a data breach notice informing him that his Private Information provided to Quantum Health was compromised during the Data Breach.

15. Plaintiff has suffered actual injury from having his Private Information exposed and/or stolen as a result of the Data Breach, including: (a) required mitigation efforts, including researching the Data Breach and needing to monitor his financial statements to ensure his information is not used for identity theft and fraud; (b) damages to and diminution of the value of his Private Information, a form of intangible property that loses value when it falls into the hands of criminals; (c) loss of privacy; and (d) continuous imminent and impending injury raising from increased risk of financial identity theft and fraud.

16. As a result of the Data Breach, Plaintiff will continue to be at a substantial and certainly impending risk for fraud and identity theft, and their attendant damages, for years to come.

17. Defendant Quantum Health, Inc. is a Delaware corporation with its principal place of business located at 5240 Blazer Parkway, Dublin, Ohio.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different

than Defendant.

19. This Court has personal jurisdiction over Defendant because it is incorporated under the laws of Ohio and maintains its principal place of business in this State, and because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in Ohio.

20. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

**FACTUAL BACKGROUND**

21. Defendant specializes in healthcare navigation and care coordination, helping members and patients manage benefits, access care, and resolve coverage or treatment questions.

22. Plaintiff and Class Members are and/or members of Defendant's clients' employer-sponsored health plans.

23. As a condition of obtaining services from Defendant, Plaintiff and Class Members directly or indirectly entrusted Quantum Health with their sensitive Private Information.

24. Plaintiff and Class Members value the confidentiality of their Private Information and, accordingly, have taken reasonable steps to maintain the confidentiality of their Private Information.

25. In turning over their Private Information, Plaintiff and Class Members reasonably expected that their provider would safeguard their highly sensitive information.

26. By obtaining, collecting, and storing Plaintiff's and Class Members' Private Information, Quantum Health assumed equitable and legal duties to safeguard Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

27. Despite these duties, Quantum Health failed to implement reasonable data security measures to protect Plaintiff's and Class Members' Private Information and ultimately allowed threat actors to breach its computer systems and exfiltrate Plaintiff's and Class Members' Private Information.

**THE VALUE OF PRIVATE INFORMATION AND EFFECTS OF UNAUTHORIZED DISCLOSURE**

28. Quantum Health understood that the Private Information it collects was highly sensitive and of significant value to those who would use it for wrongful purposes.

29. Quantum Health also knew that a breach of its computer systems, and exposure of the Private Information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised.

30. These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

31. Private Information has considerable value and constitutes an enticing and well-known target to hackers. Hackers can easily sell stolen data as there has been "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[6]

32. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[7]

33. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses,

---

[6] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last visited Sep. 3, 2026).

[7] *What To Know About Identity Theft,* FTC Consumer Advice (Sept. 2024), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited Sep. 3, 2026).

and government entities in the U.S. In 2024, there were 6,670 publicly disclosed data breaches, exposing 16.8 billion records. The United States specifically saw a 12% increase in the total number of data breaches.[8]

34. Indeed, a 2022 poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[9]

35. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2019, 3.5 million people reported some form of identity fraud compared to 5.4 million people in 2023.[10]

36. Artificial Intelligence ("AI") is also reshaping the cybersecurity landscape. "AI-related [common vulnerabilities and exposures] have surged, with 2,130 disclosed in 2025 alone –a 34.6% year-over-year increase."[11] Further, 16% of all breaches in 2025 involved attackers using AI.[12]

37. The ramifications of Quantum Health's failure to keep Plaintiff's and Class

---

[8] *2025 Global Threat Intelligence Report* 6, Flashpoint (Mar. 2025), https://go.flashpoint.io/2025_GTIR (last visited Sep. 3, 2026).

[9] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last visited Sep. 3, 2026).

[10] *Facts + Statistics: Identity theft and cybercrime*, Ins. Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Sep. 3, 2026).

[11] Peter Girnus, *et al.*, *Fault Lines in the AI Ecosystem: TrendAI™ State of AI Security Report*, TrendAI (Mar. 3, 2026), https://www.trendmicro.com/vinfo/us/security/news/threat-landscape/fault-lines-in-the-ai-ecosystem-trendai-state-of-ai-security-report (last visited Sep. 3, 2026).

[12] *Cost of a Data Breach Report 2025: The AI Oversight Gap* 37, IBM (2025), https://www.ibm.com/downloads/documents/us-en/131cf87b20b31c91 (last visited Sep. 3, 2026).

Members' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[13]

38. The exposure of highly sensitive personal information creates ongoing risk because "when highly sensitive types of data are exposed, the breach is only the beginning."[14] That risk persists as "[e]very breach feeds an underground ecosystem of exposed data. When attackers obtain highly sensitive identity credentials, they rarely use them just once. Instead, they combine information from multiple breaches to construct detailed identity profiles that can be exploited many time across different fraud scheme."[15]

39. Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the

---

[13] *Report to Congressional Requesters, Personal Information* 29, GAO (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 3, 2026).

[14] Matt Cullina, *Small Breaches, Big Consequences*, Forbes (June 10, 2026), https://www.forbes.com/councils/forbesbusinesscouncil/2026/06/10/small-breaches-big-consequences/ (last visited Sep. 3, 2026).

[15] *Id.*

likelihood that a victim will be deceived into providing the criminal with additional information.

40. Although spear phishing attacks "make up only 0.1% of all email-based attacks," their outstanding impact is reflected in the fact that "2 out of 3 successful email attacks are spear phishing attacks that use personalized messages, social engineering, and other tactics."[16]

41. A company does not become less likely to experience another breach simply because it has already experienced one; to the contrary, "[o]nce hackers realize an organization is vulnerable to an attack, they will repeatedly attempt to breach its network[.]" Further, "95% of organizations surveyed by IBM between March 2022 and March 2023 said they had experienced more than on data breach."[17]

42. Other research indicates that "[t]wo-thirds of companies that experience cyberattack are hit again within a year. These successive incidents can play out in multiple ways: simultaneously, a few days apart, or many months later."[18]

43. "It can take an average of 277 days — that's about nine months — for an organization to identify and contain a breach. During that extended period of time, not only might cybercriminal remain in the environment wreaking havoc, but the means by which they entered remains available to others as well."[19]

---

[16] *Market Report: 2023 Spear-Phishing Trends* 7, Barracuda (May 2023), https://assets.barracuda.com/assets/docs/dms/2023-spear-phishing-trends.pdf (last visited Sep. 3, 2026).

[17] Beth Stackpole, *MIT Report Details New Cybersecurity Risks*, MIT Sloan Sch. of Mgmt. (Apr. 30, 2024), https://mitsloan.mit.edu/ideas-made-to-matter/mit-report-details-new-cybersecurity-risks (last visited Sep. 3, 2026).

[18] Neil Clauson, *When Cyberattackers Strike Again – and Again*, Mimecast (Nov. 13, 2024), https://www.mimecast.com/blog/when-cyberattackers-strike-again----and-again (citation omitted), *archived at* https://web.archive.org/web/20260316001220/https://www.mimecast.com/blog/when-cyberattackers-strike-again----and-again/ (last visited Sep. 3, 2026).

[19] *Id.; see also Cost of a Data Breach*, https://www.ibm.com/downloads/documents/us-en/131cf87b20b31c91, *supra* note 12.

44. The specific types of personal data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and other Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

45. **Social Security Numbers** - Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach - unique Social Security Numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

46. Indeed, the Social Security Administration ("SSA") warns that the process of replacing a Social Security is a difficult one that creates other types of problems, and that it will not be a complete remedy for the affected person:

> You should know that other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new SSN, you shouldn't use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information isn't associated with your new number, the absence of any credit history under your new number may make it more difficult for you to get credit.[20]

47. Replacing a Social Security number does not eliminate the burden on breach

[20] *Identify Theft and Your Social Security Numbers*, SSA (Mar. 2026), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Sep. 3, 2026).

victims; it merely creates another layer of vigilance. As one source explains, "[f]irst you would have to notify every business that uses your SSN about your new number, and perhaps deal with the resulting confusion and likely mistakes, since this isn't a situation they encounter often."[21] But the caution does not end there. "[I]f a thief did anything under your old SSN, it would still reflect on you. So, now you have to stay vigilant over two SSNs."[22]

48. Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit - among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

49. Based on the value to cybercriminals of the member PII in its possession, Quantum Health knew or should have known the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its data security systems were breached. Quantum Health failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**QUANTUM HEALTH BREACHED ITS DUTY TO PROTECT MEMBERS' PRIVATE INFORMATION**

50. On or about June 1, 2026, Quantum Health became aware of a cybersecurity event.[23]

51. After becoming aware of the Data Breach, Quantum Health launched an investigation into the breach, which concluded that between May 29, 2026, and June 1, 2026, an

---

[21] *Changing Your SSN Can Double Your Trouble*, IDX (Sep. 16, 2017), https://www.idx.us/knowledge-center/changing-your-ssn-can-double-your-trouble (last visited Sep. 3, 2026).

[22] *Id.*

[23] *See* Quantum Health, https://quantum-health.com/status, *supra* note 1.

unauthorized party accessed and obtained files from certain Quantum Health systems.[24]

52. According to recent news reports, during the Data Breach, a threat actor gained access to its systems without authorization and obtained certain personal information of current and former members of Quantum Health.[25]

53. The member information compromised during the Data Breach includes, at the very least, personal information provided to Quantum Health including names, addresses, email addresses, phone numbers, dates of birth, demographic information, Social Security numbers, diagnosis and treatment information, prescriptions, provider names, dates of service, insurance information, and claims or benefits information.[26]

54. On or around August 18, 2026, nearly two months after the Data Breach began, Quantum Health reported the Data Breach to various government agencies, including the Office of the Texas Attorney General, indicating the Data Breach compromised the Private Information of 68,451 Texas residents.[27]

55. As set forth below, despite this threat, and other known threats, upon information and belief, Quantum Health failed to take any action to increase security of the Private Information it held and knew to be highly valuable to cybercriminals.

56. The Data Breach occurred as a direct result of Quantum Health's failure to implement and follow basic security procedures to protect its current and former members of its

---

[24] *Id.*

[25] Steve Alder, *Vishing Attack on Quantum Health Network Exposed Patient Data*, The HIPAA Journal (Aug. 17, 2026), https://www.hipaajournal.com/quantum-health-precision-imaging-centers-heart-america-data-breaches/ (last visited Sep. 3, 2026).

[26] *Id.*

[27] *Data Breach Security Reports*, Off. of the Tex. Atty. Gen. (Aug. 18, 2026), https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (type "Quantum Health" in search box) (last visited Sep. 3, 2026).

clients' employer-sponsored health plans Private Information that it had collected and stored.

**QUANTUM HEALTH FAILED TO COMPLY WITH FTC GUIDELINES**

57. Quantum Health is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

58. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[28]

59. Among other guidance, the FTC recommends the following cybersecurity guidelines for businesses in order to protect sensitive information in their systems: [29]

a. Identify all connections to the computers where sensitive information is stored;

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an

---

[28] *Start with Security: A Guide for Business* 2, FTC (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf (last visited Sep. 3, 2026).

[29] *Protecting Personal Information: A Guide for Business*, FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Sep. 3, 2026).

internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

60. The FTC further recommends that companies not maintain PII longer than is

needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

61. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect member data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

62. Quantum Health failed to properly implement basic data security practices. Quantum Health's failure to employ reasonable and appropriate measures to protect against unauthorized access to its members of its clients' employer-sponsored health plans' PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

63. Quantum Health was at all times fully aware of its obligations to protect the PII of its members of its clients' employer-sponsored health plans given the reams of PII that it had access to as Plaintiff's and the Class Members' provider. Quantum Health was also aware of the significant repercussions that would result from a failure to properly secure the Private Information it maintained.

**QUANTUM HEALTH FAILED TO PREVENT, IDENTIFY, AND TIMELY REPORT THE DATA BREACH**

64. Quantum Health admits that an unauthorized third-party accessed its information technology system.[30]

65. Quantum Health failed to take necessary precautions or employ adequate measures

---

[30] Quantum Health, https://quantum-health.com/status, *supra* note 1.

necessary to protect its computer systems against unauthorized access and keep Plaintiff's and Class Members' Private Information secure.

66. The Private Information that Quantum Health allowed to be exposed in the Data Breach is the type of private information that Quantum Health knew or should have known would be the target of cyberattacks.

67. Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[31] Quantum Health failed to disclose that its systems and security practices were inadequate to reasonably safeguard individuals' Private Information.

68. The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[32] Immediate notification to individuals impacted by a data breach is critical so that those impacted can take measures to protect themselves.

**THE DATA BREACH'S INCLUSION OF PHI IS PARTICULARLY SIGNIFICANT**

69. With respect to the data breaches implicating PHI, a study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[33]

70. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's

---

[31] FTC, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business, *supra* note 29.

[32] *Id.*

[33] *70% Of Data Involved In Healthcare Breaches Increases Risk Of Fraud*, DistilINFO (Oct. 3, 2019), https://distilgovhealth.com/2019/10/03/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud/ (last visited Sep. 3, 2026).

utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[34]

71. The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[35]

72. Health information in particular is likely to be used in detrimental ways - by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[36]

73. "These ransomware groups have established healthcare as a target vertical due to the critical nature of health data and the perceived willingness of healthcare organizations to pay ransoms to avoid disruption of patient care and regulatory consequences under frameworks such as HIPAA."[37]

74. Health information "remains one of the most valuable commodities in the cybercriminal underground due to its permanence, sensitivity and ability to support multiple forms of fraud simultaneously."[38]

75. Cybersecurity threat researchers warn that, "[w]hat we're seeing is not isolated cybercrime, but a mature underground economy built around healthcare." Health information has

---

[34] *Id.*

[35] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited Sep. 3, 2026).

[36] *Id.*

[37] Stephen Hilt, *et al.*, *The Cybercriminal Underground: Mapping the Healthcare Data Economy*, TrendAI (June 4, 2026), https://www.trendaisecurity.com/en-us/resources-insights/research/the-cybercriminal-underground-mapping-the-healthcare-data-economy (last visited Sep. 3, 2026).

[38] Sarah Weston, *Healthcare data has become one of cybercrime's most valuable commodities*, Intelligent CISO (June 9, 2026), https://www.intelligentciso.com/2026/06/09/healthcare-data-has-become-one-of-cybercrimes-most-valuable-commodities/ (last visited Sep. 3, 2026).

become such a valuable commodity that, "[i]nitial access brokers, ransomware affiliates, credential sellers and fraud specialists now operate as a part of an interconnected supply chain designed to monetize patient data repeatedly and at scale."[39]

76. As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a customer's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[40]

77. The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can sell for up to $1,000 online . . ."[41]

78. Specialized medical records carry an even higher price. For example, "oncology medical records can be worth between $950 and $2,000 per patient, and genomic data alone can command $1,700 to $5,000. When genomic data is linked with phenotypic data . . . the value can exceed $6,000."[42]

79. Cybercriminals sell health information at a far higher premium than stand-alone PII. This is because health information enables thieves to go beyond traditional identity theft and obtain medical treatments, purchase prescription drugs, submit false bills to insurance companies, or even undergo surgery under a false identity. The shelf life for this information is also much

---

[39] *Id.*

[40] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idx.us/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited Sep. 3, 2026).

[41] Steger, *supra* note 35.

[42] Seth Joseph, *What Is Your Health Record Worth? The Unseen Economics Behind Your Medical Data*, Forbes (Aug. 20, 2025), https://www.forbes.com/sites/sethjoseph/2025/08/20/what-is-your-health-record-worth-the-unseen-economics-behind-your-medical-data/ (last visited Sep. 3, 2026).

longer—while individuals can update their credit card numbers, they are less likely to change their health insurance information. When medical identity theft occurs, the associated costs to victims can be exorbitant. According to a 2015 study, at least 65% of medical identity theft victims had to "pay an average of $13,500 to resolve the crime."[43]

80. As noted above, some of the information that was compromised in the Data Breach included, among other things, "medical diagnoses, treatment information and prescriptions."[44] Accordingly, Plaintiff and Class Members must remain especially vigilant given the highly sensitive nature of the PHI at issue in this Data Breach.

**QUANTUM HEALTH FAILED TO COMPLY WITH HIPAA'S MANDATES**

81. Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

82. In addition, Quantum Health is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

83. HIPAA's Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information, while HIPAA's Security

---

[43] Justin Klawans, *What is medical identity theft and how can you avoid it?*, The Week (Aug. 2, 2023), https://theweek.com/feature/briefing/1025328/medical-identity-theft-how-to-avoid (last visited Sep. 3, 2026).

[44] *See* Quantum Health, https://quantum-health.com/status, *supra* note 1.

Standards for the Protection of Electronic Protected Health Information establishes national security standards for health information that is stored or transmitted electronically.

84. HIPAA requires "comply[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. Such health information includes "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

85. HIPAA's Security Rule requires entities such as Quantum Health to, *inter alia*, do the following: (i) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (ii) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (iii) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (iv) ensure compliance by its workforce.

86. HIPAA also requires entities such as Quantum Health to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Quantum Health is required under HIPAA to "[i]implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

87. Moreover, both HIPAA and HITECH required Quantum Health to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably

anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

88. Finally, HIPAA requires an entity to provide notice of a data breach to affected individuals "without unreasonable delay and in no case later than 60 days following discovery of the breach." 45 C.F.R. §§ 164.400-414.

89. Quantum Health was, at all times, aware of the mandates of HIPAA. Despite being aware of these mandates and its concomitant obligations, Quantum Health failed to comply with its obligations and protect the PHI of Plaintiff and the Class Members.

90. Defendant's failure in this regard is especially egregious given that Defendant was fully aware of the breadth and depth of PHI it obtained and stored and the foreseeable consequences that would result from unauthorized disclosure of this information.

**PLAINTIFF AND CLASS MEMBERS SUFFERED DAMAGES**

91. The ramifications of Quantum Health's failure to keep Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

92. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct. Further, the value of Plaintiff's and Class Members' Private Information has been diminished by its exposure in the Data Breach.

93. PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, credit card information can be sold at a price ranging from $10 to $240, and bank details

have a price range of $30 to $4,255.[45] "Fullz" packages, which include "extra information about the legitimate credit card owner," in case the scammer's bona fides is challenged when attempting to use the credit card, are also offered on the dark web.[46]

94. Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their Private Information as a result of the Data Breach. A recent study found that "[v]ictims of identity theft (24%) were twice as likely as nonvictims (11%) to learn that an entity with their personal information experienced a data breach in the past year."[47]

95. Further, Plaintiff and Class Members have incurred and will incur out of pocket costs for protective measures, such as identity theft protection, credit monitoring, credit report fees, credit freeze fees, and similar costs related to the Data Breach.

96. Besides the monetary damage sustained in the event of identity theft, consumers may have to spend hours trying to resolve identity theft issues. Consumer Affairs states that, "The time it takes to resolve an identity theft case can vary depending on the complexity of the situation and the cooperation of the involved parties. Resolving an identity theft case can take anywhere from a few weeks to several months or even longer . . . ."[48]

97. Plaintiff and Class Members are also at a continued risk because their information

---

[45] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, Experian (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Sep. 3, 2026).

[46] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited Sep. 3, 2026).

[47] Erika Harrell, *Just the Stats: Data Breach Notifications and Identity Theft, 2021*, Bureau of Justice Statistics (Jan. 2024), https://bjs.ojp.gov/data-breach-notifications-and-identity-theft-2021 (last visited Sep. 3, 2026).

[48] Cepeda Cheeks, *How to Report identity Theft*, ConsumerAffairs (July 25, 2023), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html (last visited Sep. 3, 2026).

remains in Quantum Health's systems, which the Data Breach showed are susceptible to compromise and attack and are subject to further attack so long as Quantum Health fails to take necessary and appropriate security and training measures to protect the Private Information in its possession.

98. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their Private Information to strangers.

99. As a result of Quantum Health's failure to prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer injuries, including out of pocket expenses; loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their valuable Private Information; the imminent and certainly impeding injury flowing from fraud and identity theft posed by their Private Information being disclosed to unauthorized recipients and cybercriminals; damages to and diminution in value of their Private Information; and continued risk to Plaintiff's and the Class Members' Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Quantum Health fails to undertake appropriate and adequate measures to protect the Private Information entrusted to it.

## CLASS ALLEGATIONS

100. Plaintiff brings this class action on behalf of himself and all other individuals who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

101. Plaintiff seeks to represent a class of persons to be defined as follows:

> All individuals in the United States whose Private Information was compromised in the Data Breach (the "Class").

102. Excluded from the Class are Quantum Health, its subsidiaries and affiliates, officers

and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

103. This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when he moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

104. **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are at minimum, tens of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach.

105. **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' Private Information, and breached its duties thereby;

c. Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

d. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct.

106. **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise

from the same unlawful and willful conduct. Plaintiff and members of the Class were all members of Defendant's clients' employer-sponsored health plans, and each had their Private Information exposed and/or accessed by an unauthorized third-party.

107. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

108. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

109. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

110. **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

111. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

112. Plaintiff re-alleges the above allegations as if fully set forth herein.

113. Plaintiff and Class Members provided their non-public Private Information to Defendant as a condition of obtaining insurance through their employer-sponsored health plans services from Defendant.

114. Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in securing, safeguarding, storing, and protecting the PII and PHI it collected from them as a condition of obtaining services from Quantum Health from being compromised, lost, stolen, accessed and misused by unauthorized parties. This duty includes, among other things, designing, maintaining, overseeing, and testing Defendant's security systems to ensure that PII and PHI in Quantum Health's possession was adequately secured and protected.

115. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if their Private Information were wrongfully disclosed.

116. Defendant owed a duty of care to Plaintiff and Class Members to provide

reasonable security, consistent with industry standards, to ensure that its systems and networks adequately protected their Private Information.

117. Defendant had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust Quantum Health with their Private Information as a condition of obtaining services was predicated on the understanding that Quantum Health would take adequate security precautions to protect their PII and PHI.

118. By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

119. Plaintiff and members of the Class entrusted Defendant with their PII and PHI with the understanding that Quantum Health would safeguard their information.

120. Defendant's conduct also created a foreseeable risk of harm to Plaintiff and Class Members by failing to: (1) secure its systems and exercise adequate oversight of its data security protocols; (2) ensure compliance with industry standard data security practices, (3) implement adequate system and event monitoring, and (4) implement the systems, policies, and procedures necessary to prevent the Data Breach.

121. Defendant knew, or should have known of, the risks inherent in collecting and storing PII and PHI, the vulnerabilities of its systems, and the importance of adequate security. Defendant should have been aware of numerous, well-publicized data breaches in the months and years preceding the Data Breach.

122. Defendant breached its common law duty to act with reasonable care in collecting and storing the Private Information of its members, which exists independently from any contractual obligations between the parties. Specifically, Defendant breached its common law,

statutory, and other duties to Plaintiff and Class Members in numerous ways, including by:

a. failing to adopt reasonable data security measures, practices, and protocols;

b. failing to implement data security systems, practices, and protocols sufficient to protect Plaintiff's and Class Members' PII and PHI;

c. storing former members' PII and PHI longer than reasonably necessary;

d. failing to comply with industry-standard data security measures; and

e. failing to timely disclose critical information regarding the nature of the Data Breach.

123. Defendant's failure to implement and maintain adequate data security measures to protect Plaintiff's and Class Members' Private Information created conditions conducive to a foreseeable, intentional criminal act in the form of the Data Breach. Plaintiff and Class Members did not contribute to the Data Breach or the subsequent misuse of their Private Information.

124. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

125. Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

126. Defendant had and continues to have duties to adequately disclose that the Private Information of Plaintiff and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiff and Class Members to take steps to prevent,

mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

127. Defendant has admitted that the Private Information of Plaintiff and Class Members was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

128. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

129. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have and will suffer damages including, but not limited to: (i) the loss of value of their Private Information and loss of opportunity to determine for themselves how their PII and PHI is used; (ii) the publication and/or theft of their PII and PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII and PHI; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII and PHI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Quantum Health fails to undertake appropriate and adequate measures to protect it; and (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised for the rest of their lives.

130. But for Defendant's wrongful and negligent breaches of duties owed to Plaintiff

and Class Members, the Private Information of Plaintiff and Class Members would not have been compromised.

131. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The Private Information of Plaintiff and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

132. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

133. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

134. In addition, Quantum Health had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting

commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

135. Furthermore, Defendant is a covered entity under HIPAA, which sets minimum federal standards for privacy and security of PHI. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et. seq.*, and its implementing regulations, Defendant had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class Members' electronic PHI.

136. Defendant's violation of federal statutes, including the FTC Act and HIPAA, constitutes negligence *per se*.

137. Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

138. Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

139. Plaintiff re-alleges the above allegations as if fully set forth herein.

140. In connection with obtaining services from Defendant, Plaintiff and Class Members entered into implied contracts with Quantum Health.

141. Plaintiff and Class Members were required to deliver their Private Information to Defendant as part of the process of obtaining services from Defendant.

142. Defendant solicited, offered, and invited Class Members to provide their Private Information in order to obtain services at Defendant's. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

143. Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

144. When Plaintiff and Class Members provided their PII and PHI to Quantum Health, either directly or indirectly, as a pre-condition for obtaining services, they entered into implied contracts with Quantum Health.

145. Pursuant to these implied contracts, in exchange for the consideration and PII and PHI provided by Plaintiff and Class Members, Defendant agreed to, among other things, and Plaintiff and Class Members understood that Quantum Health would: (1) provide products and/or services to Plaintiff and Class Members; (2) implement reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' PII and PHI; and (3) protect Plaintiff's and Class Members' PII and PHI in compliance with federal and state laws and regulations and industry standards.

146. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

147. Implicit in the agreement between Plaintiff and Class Members and Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private

Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) retain the Private Information only under conditions that kept such information secure and confidential.

148. The protection of PII and PHI was a material term of the implied contracts between Plaintiff and Class Members, on the one hand, and Defendant, on the other hand. Indeed, as set forth herein, Defendant recognized its duty to provide adequate data security and ensure the privacy of its members' PII and PHI with its practice of providing a privacy policy on its website.

149. Plaintiff and Class Members performed their obligations under the implied contract when they provided Defendant with their PII and PHI.

150. Defendant breached its obligations under its implied contracts with Plaintiff and Class Members in failing to implement and maintain reasonable security measures to protect and secure their PII and PHI, and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class Members' PII and PHI in a manner that complies with applicable laws, regulations, and industry standards.

151. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

152. On information and belief, at all relevant times, Defendant adopted and promulgated written privacy policies wherein it expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which apply to the Data Breach.

153. On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information was protected.

154. Plaintiff and Class Members would not have entrusted their Private Information to

Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

155. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

156. Importantly, Ohio law provides that every contract includes good faith and fair dealing between the parties involved.

157. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

158. Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their Private Information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that Private Information was compromised as a result of the Data Breach.

159. Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of Private Information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

160. Defendant's breach of its obligations of its implied contracts with Plaintiff and Class Members directly resulted in the Data Breach and the injuries that Plaintiff and Class Members have suffered from the Data Breach.

161. Plaintiff and Class Member suffered by virtue of Defendant's breach of their

implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft - risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII and PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII and PHI has been breached; (v) they were deprived of the value of their PII and PHI, for which there is a well-established national and international market; (vi) they have lost time and incurred expenses, and will incur future costs to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) they have overpaid for the services they received without adequate data security.

162. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

163. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

164. Plaintiff re-alleges the above allegations as if fully set forth herein.

165. This count is pleaded in the alternative to the breach of implied contract count above.

166. By its wrongful acts and omissions described herein, Defendant has obtained a benefit by unduly taking advantage of Plaintiff and Class Members.

167. Plaintiff and Class Members conferred a benefit on Defendant, whereby they

provided their Private Information to Defendant in order to obtain services from Defendant.

168. Prior to and at the time Plaintiff and Class Members entrusted it with their PII and PHI, Defendant caused Plaintiff and Class Members to reasonably believe that it would keep that Private Information secure.

169. The monies Defendant was paid in its ordinary course of business included a premium for Defendant's cybersecurity obligations and were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiff's and Class Members' Private Information.

170. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiff's retained data and used Plaintiff's and Class Members' Private Information for business purposes.

171. Defendant failed to disclose facts pertaining to its substandard information systems, or defects and vulnerabilities therein before Plaintiff and Class Members made their decisions to provide Defendant with their Private Information.

172. Defendant enriched itself by hoarding the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheap, ineffective security measures and diverting those funds to its own personal use. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security of their Private Information.

173. Defendant failed to provide reasonable security, safeguards, and protections to the

Private Information of Plaintiff and Class Members, and as a result, Defendant was overpaid.

174. Under principles of equity and good conscience, Defendant should not be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

175. Plaintiff and Class Members have no adequate remedy at law.

176. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

177. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

**COUNT IV**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

178. Plaintiff re-alleges all preceding allegations above as if fully set forth herein.

179. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

180. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' Private Information and whether Quantum Health is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Quantum Health's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of his PII and remains at imminent risk that further compromises of his PII will occur in the future.

181. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Quantum Health owes a legal duty to secure members' Private Information and to timely notify impacted individuals of a data breach under the common law, HIPAA, and various state statutes; and

b. Quantum Health continues to breach this legal duty by failing to employ reasonable measures to secure Private Information in its possession.

182. This Court also should issue corresponding prospective injunctive relief requiring Quantum Health to employ adequate security protocols consistent with law and industry standards to protect Private Information in Quantum Health's data network.

183. If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Quantum Health. The risk of another such breach is real, immediate, and substantial. If another breach at Quantum Health occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not

readily quantified, and he will be forced to bring multiple lawsuits to rectify the same conduct.

184. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Quantum Health if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Quantum Health of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Quantum Health has a pre-existing legal obligation to employ such measures.

185. Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Quantum Health, thus eliminating the additional injuries that would result to Plaintiff and members whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. For an Order certifying this action as a class action, appointing Plaintiff as class representative for the Class, and appointing his counsel to represent the Class;

B. For equitable relief enjoining Quantum Health from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII and PHI, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C. For equitable relief compelling Quantum Health to utilize appropriate methods and policies with respect to member data collection, storage, and safety, and to disclose with specificity the types of PII and PHI compromised as a result of the Data Breach;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Quantum Health's wrongful conduct;

E. Ordering Quantum Health to pay for not less than ten years of credit monitoring services for Plaintiff and Class Members;

F. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. For an award of punitive damages, as allowable by law;

H. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I. Pre- and post-judgment interest on any amounts awarded; and

J. Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 3, 2026

Respectfully submitted,

*/s/ Terence R. Coates*
Terence R. Coates (0085579)
*Trial Counsel*
Dylan J. Gould (0097954)
MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 6651-3700
Facsimile: (513) 665-0219
tcoates@msdlegal.com
dgould@msdlegal.com

Gerald D. Wells, III (*pro hac vice* forthcoming)
**LYNCH CARPENTER, LLP**
1760 Market Street, Suite 600
Philadelphia, PA 19103
T: 267-609-6910
F: 267-609-6955
jerry@lcllp.com

*Attorneys for Plaintiff and the Putative Class*